# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ULTRACLEAR EPOXY, LLC,** | ) | |
| | ) | |
| **Plaintiff/Counter Defendant,** | ) | **Case No. 3:23-cv-00715** |
| | ) | **Judge Aleta A. Trauger** |
| **v.** | ) | |
| | ) | |
| **EPODEX USA CORP.,** | ) | |
| | ) | |
| **Defendant/Counter Plaintiff.** | ) | |

## MEMORANDUM

UltraClear Epoxy, LLC ("UCE") has filed a Motion for Preliminary Injunction (Doc. No. 6), to which Epodex USA Corp. ("Epodex") has filed a Response (Doc. No. 17), and UCE has filed a Reply (Doc. No. 24). UCE has also filed a Partial Motion to Dismiss counterclaims filed by Epodex (Doc. No. 29), to which Epodex has filed a Response (Doc. No. 31), and UCE has filed a Reply (Doc. No. 33). For the reasons set out herein, each motion will be granted in part and denied in part.

## I. BACKGROUND[1]

UCE is a Tennessee-based company that sells epoxy, which is a chemical resin with various uses, including the construction of smooth surfaces for bars, counters, and tabletops. *See Isola USA Corp. v. Taiwan Union Tech. Corp.*, No. 2:12-CV-01361-SLG, 2014 WL 11292316, at *1 (D. Ariz. Dec. 11, 2014). (Doc. No. 25 ¶ 1; Doc. No. 7-1 at 6–22.) UCE holds the federal trademark registration for a mark using the name "Ultra Clear Epoxy" in a particular style with a particular geometric design. (Doc. No. 25-1.) The registration describes the registered mark as follows:

---

[1] The facts are taken primarily from the Amended Complaint (Doc. No. 25) and the Answer and Counterclaim (Doc. No. 28). Unless otherwise noted, the facts set forth in the Counterclaim and conceded in the Answer are accepted as true for the purpose of deciding the Partial Motion to Dismiss.

The mark consists of the stylized wording "ULTRA CLEAR EPOXY" in two lines with a design feature of a shaded square with beveled edges and small squares that [form] an "X" within the shaded square placed to the right of the stylized wording "ULTRA".

(Doc. No. 25-1 at 1.)

The registration does not, however, treat all of the components of that mark as equally protected. "The [United States Patent & Trademark Office ('USPTO')] may condition registration of a larger mark on the applicant's disclaimer of an 'unregistrable component of a mark otherwise registrable.'" *Royal Crown Co., Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1365 (Fed. Cir. 2018) (quoting 15 U.S.C. § 1056(a); citations omitted). "Disclaiming unregistrable components prevents the applicant from asserting exclusive rights in the disclaimed unregistrable terms." *Id.* (quoting *In re Louisiana Fish Fry Prod., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015)). Pursuant to that policy, the registration includes a disclaimer that "[n]o claim is made to the exclusive right to use the following apart from the mark as shown: 'CLEAR EPOXY.'" (Doc. No. 25-1 at 1.)

The USPTO had originally required that disclaimer to apply to the word "ultra" as well, on the ground that it was a descriptive term that did not indicate a specific provider of epoxy. UCE, however, was ultimately able to convince the USPTO that its established use of the ULTRA CLEAR EPOXY mark in commerce had created a link, in the minds of the public, between the word "ultra" and UCE. Accordingly, UCE was not required to disclaim rights related to the use of ULTRA entirely in its registration. (Doc. No. 25 ¶ 10.) As the court will discuss later in this opinion, that does not mean that UCE owns the word "ultra" or a trademark consisting of ULTRA in isolation, but it does reflect a higher degree of protection in connection with the use of that word as a mark than the USPTO recognized in connection with "clear" or "epoxy." *See* 15 U.S.C. § 1056(a).

2

Epodex is a Florida company that also sells epoxy. (Doc. No. 25 ¶ 2.) In 2020, Epodex began using the terms "ultra clear" and "ultra clear epoxy" in the packaging and marketing of some epoxy products. (*Id.* ¶¶ 13–24.) For example, UCE has provided a screenshot of an Epodex online advertisement featuring the phrase "Buy Ultra Clear Epoxy - No. 1 Epoxy Resin" and a photograph of a bottle of Epodex resin on which the phrase "ULTRA CLEAR" appears in a large font below the EPODEX mark. (*Id.* ¶¶ 16, 20.) UCE has also provided, as evidence of actual confusion between the two epoxy makers, a screenshot of a product review by an Amazon customer who appears to have mistaken an Epodex product for a UCE product based on Epodex's use of the "ultra clear" language. (*Id.* ¶ 28.)

Epodex maintains that it does not affix "ULTRA CLEAR" to its products or use that phrase in advertisements in order to evoke UCE's products. Rather, Epodex explains that its use of "ULTRA CLEAR" is specifically intended to contrast with other transparent epoxy products that it sells, which are designated only as "CLEAR." (Doc. No. 18 ¶¶ 14–18.) Epodex alleges, with screenshots, that many other epoxy makers similarly use "ultra clear" to describe their products. (*See* Doc. Nos. 20-7 to -26.) Epodex has also informed the court that it has already ceased some of the most seemingly problematic behavior that UCE has identified—specifically, the use of the phrase "Buy Ultra Clear Epoxy" in its Google ads or any use of "Ultra Clear Epoxy" in its Bing ads. (Doc. No. 18 ¶¶ 21–22.)

On July 18, 2023, UCE sued Epodex under the Lanham Act and the Tennessee Consumer Protection Act ("TCPA"). (Doc. No. 1 ¶ 32.) Two days later, UCE filed a Motion for Preliminary Injunction asking the court to order Epodex to "cease using ULTRA, ULTRA CLEAR EPOXY, or any confusingly similar variation of the foregoing pending a final decision on the merits." (Doc. No. 6 at 2.) UCE also asks the court to "direct[] [Epodex] to file with the Court a report in writing under oath setting forth in detail the manner and form in which [it] has complied with the

3

injunction." (*Id.*) Epodex filed a Response opposing the request, arguing that UCE is unlikely to succeed on the merits and has not demonstrated that it would suffer irreparable harm if an injunction were denied. (Doc. No. 17 at 1.)

On September 28, 2023, Epodex filed an Answer and Counterclaim that, among other things, provides additional background regarding the parties' dealings. (Doc. No. 28.) Epodex asserts that UCE has been aggressively issuing "takedown notices" to Amazon and Facebook/Instagram regarding listings and marketing for Epodex products that, according to UCE, infringed on UCE's rights in connection with the ULTRA CLEAR EPOXY mark. A "takedown notice" is a "written communication provided to the designated agent of [an online] service provider" informing the agent of alleged infringement by another party through its platform and demanding that the infringing content be taken down.. 17 U.S.C. § 512(c)(3) (discussing copyright takedown notices).[2] For example, if the owner of the rights to a copyright-protected film found that a copy of that film had been placed on YouTube by someone without the right to do so, that rights holder could file a takedown notice with the platform in order to have the film removed. As a result of UCE's takedown notices, Epodex asserts, Amazon and other sites have removed Epodex listings or other materials that should not have been removed. (*Id.* ¶¶ 40–91.)

UCE filed seven counterclaims. Count I is for cancellation of UCE's ULTRA CLEAR EPOXY registration. Counts II and III are alternative claims for intentional/tortious interference in Epodex's business relationship with Amazon, under either Florida or Tennessee law, depending on which one the court holds to be applicable. Counts IV and V are similar claims

---

[2] The notice-and-takedown structure is formalized, for the purposes of copyright, in the Digital Millenium Copyright Act ("DMCA"). *See* 17 U.S.C. § 512. Although the DMCA does not govern trademark claims, the same general process appears to be used.

involving Meta, which owns Facebook and Instagram. Counts VI and VII are claims under Tennessee's and Florida's respective consumer protection statutes. (*Id.* ¶¶ 92–161.)

On October 19, 2023, UCE filed a Partial Motion to dismiss directed at Epodex's Counts II through VII. (Doc. No. 29.) UCE argues, first, that the claims are barred by the rule typically referred to as the "*Noerr-Pennington* doctrine," for *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). UCE argues, in the alternative, that Epodex's counterclaims do not state grounds on which relief could be granted under either Florida or Tennessee law. (Doc. No. 29 at 1.) Epodex opposes the motion, except with regard to Count VII. (Doc. No. 31 at 20.)

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

**B. Motion to Dismiss**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

**A. Motion for Preliminary Injunction**

### 1. Nature of the Parties' Disagreement

Epodex argues that UCE has failed to establish that any of the four preliminary injunction factors supports an award of preliminary relief. Most of Epodex's arguments, however, stem from the same basic issue: the weakness of UCE's rights in connection with commercial uses of the word "ultra" or the phrase "ultra clear." UCE holds a registration for a design mark that includes those terms, but no registration for a word mark based on the relevant word or phrase in isolation. "Clear," as Epodex points out, describes a particular trait that epoxy can have, and "ultra" is a modifier commonly used in marketing to mean something like "especially." Epodex argues that, insofar as UCE has any right to control the use of those terms, it is a relatively weak right that would not prevent Epodex's uses. Accordingly, Epodex argues, UCE has little likelihood of success.

The same contextual facts making UCE's rights weak, Epodex suggests, also undermine any argument that UCE faces a significant likelihood of irreparable harm, because no harm would arise from Epodex's simple use of ordinary language to describe its products. Epodex says that it would be substantially harmed by having to alter its packaging and marketing, and, it argues, the public would be harmed by an unnecessary restraint on competition.

2. The Strength and Scope of UCE's Trademark Rights

"A trademark is 'any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods . . . .'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting 15 U.S.C. § 1127). A word or design does not become a protected trademark, however, simply because someone intends it to be one. For one thing, "[t]rademark rights arise from the actual use of the mark in commerce." *Haas Door Co. v. Haas Garage Door Co.*, No. 3:13 CV 2507, 2016 WL 1047242, at *6 (N.D. Ohio Mar. 16, 2016) (*Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998)). Even a mark's use in commerce,

7

though, does not necessarily render it a protectable trademark, because some words and images are simply incapable of signaling a specific origin of a good or service in a particular context. For example, a dairy might put the word "milk" on every one of its bottles for years, but it would not acquire trademark rights in the MILK word mark, because, in order to signal the origin of a good or service, a mark "must be distinctive," and there is nothing distinctive about simply describing a product by its generic name. *Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x 53, 55 (6th Cir. 2012) (citing *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002)).

As the Supreme Court has noted, "[m]arks are often classified in categories of generally increasing distinctiveness; following the classic formulation . . . , they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir. 1976)). The latter three categories—"suggestive," "arbitrary," and "fanciful" marks— are considered inherently distinctive, simply by virtue of their tenuous relationship to the product described, such as the relationship between APPLE and computers or the relationship between a wholly invented word and any type of product. *Id.* On the other end of the spectrum, "generic" marks—like the aforementioned MILK, used in connection with milk—"are never protected under the Lanham Act." *Curcio Webb LLC, v. Nat'l Benefit Programs Agency, Inc.*, 367 F. Supp. 2d 1191, 1208 (S.D. Ohio 2005) (citation omitted); *see also Two Pesos*, 505 U.S. at 768 ("[G]eneric marks . . . are not registrable as trademarks.").

Between those two poles, however, are "descriptive" marks, which have no inherent distinctiveness, but which may become registrable and protectable, if they have acquired a "secondary meaning" through their actual use in commerce. *Two Pesos*, 505 U.S. at 769. For example, the Sixth Circuit has identified "BEST, SUPERIOR, and PREFERRED" as marks that,

8

though lacking any inherent distinctiveness, may become protectable through distinctiveness acquired from their use over time by a particular purveyor.[3] *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (citing J. Thomas McCarthy, McCarthy's Desk Encyclopedia of Intellectual Property 93 (1991)). UCE's trademark registration acknowledges that, insofar as UCE has a right to constrain any other party's use of the ULTRA or ULTRA CLEAR marks, those rights would arise from those marks' having acquired distinctiveness through their usage by UCE. (Doc. No. 25-1 at 1.)

Epodex disputes that UCE has any meaningful rights associated with the ULTRA mark. As UCE points out, however, the USPTO, which was initially skeptical of any such rights, eventually became convinced of UCE's position, and "[r]egistration of a trademark gives rise to a rebuttable presumption that the trademark is valid." *Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006) (citations omitted). Epodex maintains that UCE's registration should not have been issued in its current form and should be cancelled.

Even if the registration was properly issued, however, Epodex argues that UCE's rights are significantly narrower than it asserts. "[A] trademark, unlike a copyright or patent, is not a 'right in gross' that enables a holder to enjoin all reproductions." *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 922 (6th Cir. 2003) (quoting *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 35 (1st Cir.1989)). Rather, trademark rights only entitle the holder to protection from certain potentially damaging commercial uses. *Id.* The elements of a claim for trademark infringement under the Lanham Act reflect that narrow grant of rights, establishing liability only where the

---

[3] Other commonly cited examples of descriptive terms include "After Tan post-tanning lotion" for lotion that one uses after one tans and, particularly relevant to this case, "5 minute glue" for glue that dries in five minutes. *Passport Health, LLC v. Avance Health Sys., Inc.*, 823 F. App'x 141, 148 (4th Cir. 2020) (citing *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 661 (4th Cir. 2018)).

9

defendant uses the plaintiff's mark (1) in commerce and (2) in a manner that is likely to cause confusion. *See* 15 U.S.C. § 1114(1).

The first factor that a court typically considers in determining likelihood of confusion is the "strength" of the plaintiff's mark—with the understanding that, the weaker a mark is, the less likely it is that some use of the same or similar language or imagery will actually confuse a consumer.[4] *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 548 (6th Cir. 2005) (citing *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999)). "[T]he strength of a trademark for purposes of the likelihood-of-confusion analysis depends on the interplay between conceptual and commercial strength . . . ." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012). The descriptive nature of the word "ultra" suggests that the inherent, "conceptual" strength of UCE's mark is quite low, even if that low distinctiveness has been burnished by "commercial" strength arising from UCE's activities in the market. UCE is only entitled to protection from uses presenting an actual likelihood of confusion, and the likelihood of confusion must be considered in the context of the mark's relatively limited strength.

Even if the USPTO was correct in acknowledging some rights in connection with "ULTRA," then, that does not mean that UCE can simply prevent its competitors from using the term. Rather, they simply must refrain from using it in a way likely to confuse consumers. The fact that "ultra clear" can be understood as a straightforward description of a particular epoxy's traits, moreover, reduces the possibility that a consumer would misread the term as a brand name, unless it was presented in a misleading way. Accordingly, infringement would likely only

---

[4] The other non-exclusive factors typically considered are "2. relatedness of the goods or services, 3. similarity of the marks, 4. evidence of actual confusion, 5. marketing channels used, 6. likely degree of purchaser care, 7. the defendant's intent in selecting its mark, and 8. likelihood of expansion of the product lines." *Jet, Inc.*, 165 F.3d at 422 (quoting *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).

occur when the particular visual and/or contextual details of the defendant's use supported a likelihood of confusion based on more than the words alone. UCE, for example, cites the prominence of the "ULTRA" on Epodex's packaging as well as Epodex's font choice as additional factors increasing the likelihood of confusion.

The restriction of ordinary trademark rights to confusing commercial uses is further supported by the rule that, "[u]nder the doctrine of 'fair use,' the holder of a trademark cannot prevent others from using the word that forms the trademark in its primary or descriptive sense." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 319 (6th Cir. 2001) (emphasis omitted). "In evaluating a defendant's fair use defense, a court must consider whether defendant has used the mark: (1) in its descriptive sense; and (2) in good faith." *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d at 920 (citations omitted). In order to meet those requirements, the mark may not be used in a "trademark way," but, rather, merely to convey some information other than the source of the product. *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018) (citations and internal quotation marks omitted). Pursuant to those principles, "fair use permits others to use a protected mark to describe aspects of their own goods, provided the use is in good faith and not as a mark." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995) (citing 15 U.S.C. § 1115(b)(4)). Epodex argues that it has a fair use right to use the term "ultra clear" to describe its epoxy, because that is simply the appropriate descriptor that would allow a consumer to know what kind of epoxy he is buying.

It is difficult to assess the ultimate viability of the parties' respective positions at this stage, because the strength of their respective rights depends on contextual factors on which the court has limited information. In particular, while there is evidence to show that UCE established enough goodwill associated with the ULTRA CLEAR EPOXY mark to avoid an outright disclaimer of ULTRA in its registration, the strength and scope of UCE's rights depend on how

11

commonly and widely the word "ultra" is used in the epoxy market and adjacent markets. Those same facts, moreover, would be highly relevant to the extent of Epodex's fair use rights; if it really is entirely common to use "ultra" in this way, then that would be evidence of both descriptive use and good faith. If, however, such uses are not common, then Epodex's arguments will be less convincing.

UCE has produced some evidence relevant to the strength of UCE's mark, but the court does not find it sufficient to establish that UCE's rights are as strong as it says they are. For example, UCE has provided evidence that "[c]ustomers consistently refer to [its] mark ULTRA CLEAR EPOXY when writing product reviews." (Doc. No. 7-1 ¶ 5.) The fact that customers simply use a product's actual name, however, is evidence of very little. If a person is named John Smith, people will call him "John Smith." That does not make his name uniquely associated with him. The same principle applies to products.

UCE also points to facts showing its significant place in the epoxy market, such as that it has spent more than $6 million dollars on advertising, that it has millions of visitors to its website, and that UCE's "high visibility on Google indicates a strong digital presence." (*Id.* ¶¶ 6–7, 14.) Those facts are not irrelevant to the strength of UCE's mark, but they are far from dispositive, because what ultimately matters is not simply what UCE has done, but what consumers think, and consumers are influenced by more than just who spends the most advertising money. The court cannot just assume that a descriptive word, plus money spent, equals high acquired distinctiveness. Without evidence of the public's attitudes—such as survey evidence or analysis of the use of the word "ultra" across platforms that UCE does not control— the court can only guess at how strong UCE's rights are. *See Kibler v. Hall*, 843 F.3d 1068, 1074 (6th Cir. 2016) ("Survey evidence is not a prerequisite for establishing public recognition, but it is the most persuasive evidence of it.").

12

Epodex, moreover, has produced evidence supportive of the conclusion that "ultra clear" is, in fact, a widely used term in the sale of epoxy by many non-UCE brands. Epodex has provided screenshots of commercial listings of numerous other epoxy brands referring to their products as "ultra clear." *(See* Doc. No. 20-16 to -25.) Epodex has also identified U.S. trademark registrations that the USPTO has granted to UCE competitors for marks using "ULTRA" in connection with the sale of epoxy—such as, for example, ULTRA LITE and EPOXY ULTRA+. (Doc. Nos. 20-27 to -29.)

### 3. Application of the Preliminary Injunction Factors

Based on the foregoing, the court finds that UCE has established a moderate likelihood of success—with a somewhat higher likelihood of success with regard to a few specific instances of past infringement in advertisements. Whether ULTRA has acquired distinctiveness through use is largely a factual question, and, while UCE has provided some evidence in support of its position, it is entirely possible that a full survey of the epoxy market during the relevant years would undermine that evidence. Epodex is, moreover, correct that, insofar as UCE has meaningful rights in connection with the ULTRA mark at all, they are relatively weak rights, constrained both by (1) the fact that there are many non-confusing ways to use the term in connection with epoxy and (2) Epodex and any other UCE competitor has a fair use right to use descriptive language in good faith. Some of the uses that UCE has identified—particularly the now-discontinued online advertisements—appear to be confusing enough, on their face, that UCE would be likely to prevail regarding discrete claims based on those instances, as long as it can establish some minimally protectable rights in connection with its name. Other allegedly infringing uses by Epodex, however, are significantly more debatable and would likely hinge not only on whether UCE has some rights, but how strong those rights are and how compelling Epodex's evidence in support of fair use turns out to be.

13

For the same reasons, the court finds that UCE has shown at least some likelihood of some irreparable injury if an injunction is not issued, but that the likely injury established is less than UCE suggests. In 2020, "Congress updated the Lanham Act to provide a 'rebuttable presumption of irreparable harm upon . . . a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.'" *Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*, 575 F. Supp. 3d 785, 840–41 (W.D. Ky. 2021). Even prior to that statutory amendment, however, a number of courts had applied that approach, based on the nature of the underlying interests protected by trademark law. *See Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991). As the court has already discussed, trademark law is not, for the most part, about protecting words or designs in and of themselves, in the manner that copyright does. Trademark law protects reputational goodwill—and the ability to both build and monetize that goodwill by indicating oneself as the source of goods. A loss of control over one's reputation is plausibly an irreparable injury, because purely economic relief at the end of litigation could not turn back the clock on that loss of control. *Id.* The court does not find that Epodex has fully rebutted UCE's presumption of that type of irreparable harm. The same likelihood of confusion analysis applicable to success on the merits applies here; it is plausible that some of Epodex's cited uses have led to, and would continue to lead to, some genuine consumer confusion, to the detriment of UCE's power to control its own reputation.

A presumption of some irreparable injury, however, is not a presumption that the injury will be a large one. UCE has not established that any loss of control of its reputation in the absence of an injunction would be particularly damaging. Moreover, UCE has failed to show that the breadth of the injunction that it proposes—which would largely prevent Epodex from commercially describing its epoxy as "ultra clear" at all—would be necessary to prevent that

14

harm. This factor, like likelihood of success on the merits, supports some relief, but only weakly so.

Epodex's arguments about its own legitimate interests and the interests of the public, moreover, are not without merit. Epodex has filed a Declaration by one of the employees in charge of its internet presence, explaining that "clarity is one of the most important features" of an epoxy product and that the company needs to be able to inform its customers that the epoxy it sells as "ULTRA CLEAR" offers a level of clarity higher than the epoxy it sells as merely "CLEAR." (Doc. No. 18 ¶¶ 17–18.) While there are, of course, other ways to say "especially," "very," or "extra," Epodex has plausibly shown that it would face a meaningful disadvantage in the epoxy market if it were wholly prevented from contrasting its products in the current form. The public would likely be harmed as well, because a restriction on Epodex's ability to compete in the epoxy market would constrain, or at least complicate, consumer choice. That harm would probably be relatively limited, but, as the court has held, so would UCE's.

The court, accordingly, will grant UCE a preliminary injunction, but not one as broad as it has requested. UCE's real, but not overwhelming, likelihood of success, combined with the uncertainty regarding the extent or severity of any irreparable injury, are not sufficient to support an order that would effectively require Epodex to wholly cease its commercial usage of the phrase "ultra clear" within the United States. Some of Epodex's past online advertisements, however, are particularly problematic—as Epodex seems likely to have realized, given that it has ceased to run those ads and made a point of informing the court that it did so. UCE has established an entitlement to an injunction formalizing that practice and expanding it beyond the specific actions that Epodex has already taken. The court, accordingly, will order Epodex to discontinue all online advertisements in which the phrase "ultra clear epoxy" appears prior to and/or more prominently than the EPODEX mark or another Epodex-owned brand name, insofar

15

as any such name exists. The court will not enjoin Epodex's use of any phrase or mark outside of advertisements—such as in actual listings for sale—because UCE's demonstrated likelihood of success and likelihood of future harm are significantly lower in connection with those contexts. In light of the narrow nature of the court's order, the court will not require Epodex to file any notice or report attesting to its compliance.

## B. Motion to Dismiss

### 1. *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine dictates that "defendants are immune from" certain types of "liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014) (citing *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993)). *Noerr-Pennington* immunity was first developed in the antitrust context, where it was recognized to reflect "the principle that the antitrust laws regulate business, not politics" or the judicial process. *VIBO Corp. v. Conway*, 669 F.3d 675, 684 (6th Cir. 2012) (quoting *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 383 (1991)). To that end, "'[w]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (quoting *Noerr*, 365 U.S. at 136).

The *Noerr-Pennington* doctrine, however, is based on more than merely a reading of the purposes of antitrust statutes. It also has a constitutional character, arising out of the Petition Clause of the First Amendment. *See Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007). Accordingly, in the years since the *Noerr-Pennington* doctrine was recognized, "the federal courts have by analogy applied it to claims brought under both state and federal

16

laws, including common law claims of tortious interference." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (citing *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988)).

The *Noerr-Pennington* doctrine protects the decision to commence litigation, as long as the litigation itself is more than merely a "sham" to obtain a competitive advantage. *See EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*, No. 19-13698, 2021 WL 843145, at *5 (E.D. Mich. Mar. 5, 2021) (discussing "sham exception" to *Noerr-Pennington*). Some "courts have also applied the doctrine to protect pre-litigation activities, including cease-and-desist letters" to alleged infringers.[5] *J.M. Smucker Co. v. Hormel Food Corp.*, 526 F. Supp. 3d 294, 308 (N.D. Ohio 2021). UCE, however, suggests that the protection afforded by *Noerr-Pennington* should be construed even more broadly, to "bar[] claims for tortious interference arising from a party's acts taken to protect its intellectual property rights," even if those acts that do not involve any express threat of litigation or, in fact, any direct communication with the primary infringer[6] at all. (Doc. No. 30 at 4.) Pursuant to that broad reading, UCE argues, its takedown notices cannot form the basis of liability, even if those notices were ultimately unfounded or even recklessly issued, as long as they were not outright shams. Epodex disagrees and argues that takedown notices are simply communications from one private entity to another, involving no threat of litigation, and do not fall within the class of activities that the *Noerr-Pennington* doctrine is intended to protect.

---

[5] It does not appear that the Supreme Court has ever expressly endorsed the extension of *Noerr-Pennington* to cease-and-desist letters.

[6] The term "primary infringer" refers to the party actually using the underlying intellectual property unlawfully—in this instance, allegedly, Epodex. In contrast, a "secondary infringer" is one who "infringes contributorily by intentionally inducing or encouraging direct infringement" or "infringes vicariously by profiting from direct infringement while declining to exercise the right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 914 (2005). An internet service provider that disregards takedown notices runs the risk of being considered a secondary infringer.

17

A number of courts have considered this issue, although the Sixth Court does not appear to be among them. The U.S. District Court for the Southern District of California, for example, found takedown notices to fall outside of *Noerr-Pennington* on the ground that "Amazon is a corporation[,] . . . not part of the government," and, "as a result, there is no constitutionally protected right to 'petition' Amazon for a redress of grievances." *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1241 (S.D. Cal. 2021). The U.S. District Court for the District of New Jersey has agreed. *See LY Berditchev, Corp. v. Truss Cosms. Corp.*, No. CV2204242KMCLW, 2023 WL 334539, at *9 (D.N.J. Jan. 20, 2023). The U.S. District Court for the Northern District of Illinois reached a similar conclusion. *See Garmon Corp. v. Vetnique Labs, LLC*, No. 19 C 8251, 2020 WL 3414983, at *4 (N.D. Ill. June 22, 2020). The Ninth Circuit addressed the issue, albeit only briefly, in an unpublished opinion, writing that the court saw "no justification to apply . . . the doctrine to" takedown notices, "which were delivered solely to a third party and which did not propose or threaten litigation." *Thimes Sols., Inc. v. TP Link USA Corp.*, No. 21-55407, 2022 WL 1125628, at *2 (9th Cir. Apr. 15, 2022).

In response to Epodex's citation to those rulings, UCE provides a list of cases suggesting that "the doctrine applies to pre-litigation letters and similar conduct." (Doc. No. 33 at 1.) Only one of those cases, however, involved takedown notices of the type at issue here. *See Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*, No. C14-0950 RSM, 2014 WL 6452173, at *3 (W.D. Wash. Nov. 17, 2014), *aff'd sub nom. Hard2Find Accessories, Inc. v. Amazon.com, Inc.*, 691 F. App'x 406 (9th Cir. 2017). Another of the cited cases involved "pre-suit communications to third parties," but those communications appear to have been far more detailed than a simple takedown notice is required to be. *See Racetech, LLC v. Kentucky Downs, LLC*, 169 F. Supp. 3d 709, 715 (W.D. Ky. 2016); *see also Barq's Inc. v. Barq's Beverages, Inc.*, 677 F. Supp. 449, 453 (E.D. La. 1987) (applying *Noerr-Pennington* to "attempting to influence bottle cap suppliers not

18

to do business with defendants"). The rest of the cases, however, mostly involved the same specific activity: threatening the primary infringer, and occasionally someone else closely associated with that infringer, with a lawsuit. *See Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1344 (Fed. Cir. 1999) ("actual or threatened infringement suits"); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985) ("the threat of litigation"); *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1130 (D. Minn. 2016) ("directly threaten[ing] . . . competitors and food company buyers with patent infringement suits"); *Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*, 634 F. Supp. 316, 326 (D. Kan. 1986) ("threats of litigation against [the defendant's] customers"); *see also Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 97 (2d Cir. 2000) (signal-strength challenges under the Satellite Home Viewer Act); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1559 (11th Cir.) (litigation and the direct threat of litigation); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983) ("a warning that [litigation] will be commenced and a possible effort to compromise the dispute").

This court agrees with the courts that have held that takedown notices fall outside the scope of *Noerr-Pennington* protection, at least for the purposes of intentional interference and consumer protection-based claims against the primary infringer. A takedown notice is one private party asking another private party to do something to a third private party. There is, therefore, no argument that a takedown notice would fall within the core activities that the *Noerr-Pennington* doctrine was originally intended to protect. While some courts have expanded the boundaries of that protection to certain other activities incidental to litigation—particularly, direct threats of filing suit—that is a far cry from suggesting *any* assertion of rights between private parties is inherently entitled to *Noerr-Pennington* protection. Rather, some courts have held that it is necessary to shield certain discrete actions, like cease-and-desist letters, from

19

liability in order to "give adequate 'breathing space' to the right of petition." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006). UCE, however, has made no showing that any such purpose would be accomplished by extending *Noerr-Pennington* to takedown notices. A takedown notice is neither a threat of, nor a precondition to, litigation against the primary infringer. It is simply a request for private, third party action.

The particular features of takedown notices, moreover, raise specific concerns that cease-and-desist letters do not. A cease-and-desist letter is a demand that the alleged infringer take action. If the recipient believes that he is acting within his rights, he can simply ignore what he believes to be an unfounded, and quite possibly empty, threat, with the knowledge that, for the rights holder to actually stop him, that rights holder will have to go to court—the activity that *Noerr-Pennington* protects. A takedown notice, in contrast, involves an appeal to a third party to take action against the alleged infringer. It is a direct attempt to inflict harm *outside* of the judicial process, which the target of the notice cannot freely disregard. The severe anticompetitive risks of allowing one market participant to leverage a private party to squelch the commercial speech of a competitor are obvious.

The notice-and-takedown process, moreover, is specifically designed to be simple and quick, which makes it both particularly susceptible to abuse and plainly distinguishable from the demanding process of preparation for litigation. Litigation is intensive and focused, whereas takedown notices are bare-bones and frequently done in bulk. One law professor's 2013 analysis found that "[m]ainstream copyright owners now send takedown notices for more than 6.5 million infringing files, on over 30,000 sites, each month."[7] Bruce Boyden, *The Failure of the DMCA Notice and Takedown System: A Twentieth Century Solution to a Twenty-First Century Problem*,

---

[7] That number, it bears noting, only includes the copyright-related takedown notices; the number including trademark-related notices would be even larger, and the number including patent-related notices larger still.

Ctr. for the Prot. of Intell. Prop. (Dec. 2013). It strains credulity to suggest that those millions upon millions of notices were preparatory to litigation, even hypothetically. Rather, it appears that most takedown notices are exactly what they appear to be: attempts to have one private party remove another private party's materials from valuable online real estate—that is to say, in many cases, one business asking another business to stop selling a competing product. Expanding *Noerr-Pennington* liability to such actions, despite their plain capacity for anticompetitive harm and the complete lack of any necessary connection to a reasonably contemplated petition to the government, would be an extraordinary step—and a far more serious extension of the doctrine than simply holding, as some courts have, that *Noerr-Pennington*'s protection of litigation itself extends to the secondary action of warning a primary infringer before suing it.

In any event, even if the court found the *Noer-Pennington* doctrine to apply to takedown notices generally, the court could not dismiss Epodex's counterclaims on that basis, because Epodex has plausibly alleged that at least some of the takedown notices at issue would fall within that doctrine's sham exception. While the sham exception sets a high bar, it is a surmountable one; the plaintiff must only show that the defendant knew that "no reasonable litigant could realistically expect success on the merits." *Prof'l Real Est. Invs., Inc.*, 508 U.S. at 60. UCE has pleaded facts that would, if proven, be inconsistent with such a holding, but, because this issue is arising in connection with a Rule 12(b)(6) motion directed at Epodex's claims, UCE's assertions are not entitled to a presumption of truth. Epodex has alleged that UCE, based on its substantial experience in the epoxy field, knew that "ultra clear" was a widely used descriptive term throughout the industry, such that, if UCE had any rights in connection with those words at all, those rights would be limited to a handful of genuinely confusing potential uses and would not extend to each of the individual listings for which UCE filed a takedown notice. If UCE knew those facts and sent takedown notices directed at clearly lawful uses anyway, those actions

21

would fall within the sham exception. The court, accordingly, cannot dismiss any counts on this basis.

### 2. Tortious Interference with Business Relationships (Counts II–V)[8]

Under Tennessee law, the "tort of intentional interference with business relationships" requires a plaintiff to establish "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (citations omitted). Florida's version of the tort is similar, requiring the plaintiff to show "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Font & Nelson, PLLC v. Path Med., LLC*, 317 So. 3d 134, 138–39 (Fla. Dist. Ct. App. 2021) (citations omitted).

UCE's arguments for dismissal under the two states' laws are similar, as well: it argues that the Tennessee claims should be dismissed because UCE did not have a predominant improper motive or use improper means, and it argues that the Florida claims should be dismissed because its actions were not "unjustified." In other words, it argues that all of the intentional interference in business relationships claims should be dismissed, because UCE's takedowns were permissible attempts to safeguard its intellectual property rights.

---

[8] Neither party has engaged in a full choice-of-law analysis in its briefing, so the court will consider both the Tennessee law and Florida law claims—with the exception of Count VII, which Epodex has voluntarily withdrawn. (Doc. No 31 at 19.)

22

For reasons that the court has already discussed, the question of whether UCE's takedown notices had an improper purpose and/or were unjustified cannot be answered on the pleadings alone. Epodex has plausibly pleaded that no reasonable party in UCE's position would earnestly believe itself to have rights to the extent that it has claimed. Whether that is true depends on contextual facts involving the market for epoxy that are not in the record. At this stage, though, Epodex's allegations are sufficient to permit it to proceed.

### 3. Florida Deceptive and Unfair Trade Practices Act (Count VI)

Although Epodex has withdrawn Count VII, under the Tennessee Consumer Protection Act, it still wishes to pursue Count VI, under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). UCE argues that that count should be dismissed, however, because (1) FDUTPA only grants a cause of action to consumers, not competitors and (2) UCE has failed to allege the elements of the underlying claim.

Regarding the first argument, Epodex points out that, while UCE's position may have been an accurate statement of Florida law at one time, at least as to damages, Florida's intermediate appellate courts[9] have held, on multiple occasions, that, under the current version of the Act, a non-consumer may bring a claim as long as the underlying allegations involve an adequate injury to consumers. *See Bailey v. St. Louis*, 196 So. 3d 375, 383 (Fla. Dist. Ct. App. 2016); *Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*, 187 So. 3d 868, 870 (Fla. Dist. Ct. App. 2016); *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015). Indeed, as those cases discuss, it appears that an

---

[9] "A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).

23

amendment was made specifically to reject the position that UCE now advocates, changing "consumer" in the relevant language to "person." *See Bailey*, 196 So. 3d at 383. UCE's argument that one must be a consumer to sue under the FDUTPA is, therefore, mistaken.

Even if Epodex has the *power* to bring a cause of action under the FDUTPA, however, it still must adequately set forth facts that, if true, would state a claim for which relief can be granted. "A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Caribbean Cruise Line*, 169 So. 3d at 167 (quoting *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009)). UCE argues that Epodex has failed to allege that UCE engaged in any deceptive or unfair practice, as that term is defined under Florida law, because UCE's actions at issue were neither directed at consumers nor in violation of any other Florida law or statute.

The FDUTPA, in its current form, forbids all "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204(1). The Act further states that a finding of a "[v]iolation of this part" may be "based upon" any of the following:

> (a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 et seq.;
>
> (b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts; or
>
> (c) Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

Fla. Stat. Ann. § 501.203(3). Absent context, the Act's references to "unfair methods" and "unconscionable acts" are both vague and potentially very broad. Courts, however, have interpreted the FDUTPA in the context of the history of the statute, leading them to conclude that there are ultimately two species of claims authorized by the Act: (1) consumer-focused claims

24

based on practices that are "likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment"; and (2) so-called "*per se*" claims "stem[ming] from the transgression of '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.'" *Blair v. Wachovia Mortg. Corp.*, No. 5:11-CV-566-OC-37TBS, 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012) (quoting *Sundance Apartments I, Inc. v. Gen. Elec. Cap. Corp.*, 581 F. Supp. 2d 1215, 1220 (S.D. Fla. 2008); *Feheley v. LAI Games Sales, Inc.*, No. 08-23060-CIV, 2009 WL 2474061, at *4 (S.D. Fla. Aug. 11, 2009).

Epodex does not argue that its FDUTPA claims involve representations to consumers. Nor does Epodex identify a particular law on which it intends to rely in support of an alleged *per se* violation.[10] Rather, it relies on the Florida Supreme Court's language in *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773 (Fla. 2003), stating that "[a]n unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Id.* at 777 (citation omitted). The Florida Supreme Court, however, expressly stated, in that case, that "[t]he only issue" it was addressing was "whether the FDUTPA may be applied in a private cause of action arising from unfair or deceptive acts involving a single party in a single transaction or directed to a single contract." *Id.* at 775. The cited language, therefore, is *dictum* and provides this court with no basis for disregarding the conclusions by other courts that a plaintiff seeking to assert a claim under the FDUTPA must allege either a claim based on the misleading of consumers or some predicate violation of another law. The court, therefore, will dismiss Count VI.

---

[10] As the court has already discussed, Epodex has, in fact, alleged another violation of Florida law, in the form of intentional interference in business relationships. Epodex, however, does not argue that that violation could serve as a predicate to an FDUTPA violation.

**IV. CONCLUSION**

For the foregoing reasons, UCE's Motion for Preliminary Injunction (Doc. No. 6) and Partial Motion to Dismiss (Doc. No. 29) will each be granted in part and denied in part. The court will grant a limited injunction directed at the misuse of the ULTRA CLEAR mark in online advertisements, and the court will dismiss Epodex's Counts VI and VII.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge